

**FILED**

JUN 1 8 2019

Clerk, U.S. District Court
District Of Montana
Missoula

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JOHN DANIEL FAILS, JR., | CV 17-120-BLG-TJC |
| Plaintiff, | |
| vs. | ORDER |
| SHERIFF TONY HARBAUGH, UNDER SHERIFF PAT ROOS, SECURITY SERGEANT ROLAND MCGRATH, and REGISTERED NURSE KIM JERKE, | |
| Defendants. | |

Pending before the Court is Defendants' Fed. R. Civ. P. 56 Motion for Summary Judgment. See, (Doc. 42.) For the reasons discussed herein, the Court will grant Defendants' summary judgment motion.

Also pending are three outstanding motions from Fails, (Docs. 35, 37 & 55), as well as Defendants' motion to modify. (Doc. 51.) Each will be addressed in turn.

## I.    Fails' Outstanding Motions

Fails filed a Motion for a Protective Order alleging that Defendants were attempting to "oppress, harass, cause undue burden and expense" upon Fails with their purportedly irrelevant interrogatories and production requests in violation of

1

Fed. R. Civ. P. 26. (Doc. 35 at 2-3.) Defendants responded by alleging that

Fails did not comply with the meet and confer requirements of Rule 26(c)(1), and

further contended that the information sought was discoverable and relevant to the

Fails' compensatory damages claim. (Doc. 40 at 2-3.) Fails did not reply.

Fails also filed a motion to compel, seeking an order from this Court

directing the Defendants to respond to Fails' Interrogatory No. 4. The

interrogatory at issue apparently read:

> Please describe in detail of all civil rights violations, constitutional rights
> violations, grievances, civil complaints, criminal complaints, disciplinary,
> etc..., alleging any type of official misconduct, and/or similar claims as are
> alleged in this current 42 U.S.C. §1983, from the beginning of each of the
> named defendants in this 42 U.S.C. §1983 from the date of their chosen
> profession, including any state, local, or federal agencies.

(Doc. 37 at 2.) In response, Defendants again asserted Fails made no effort to

comply with Rule 37(a)(1), which requires that a motion to compel "must include a

certification that the movant has in good faith conferred or attempted to confer

with the person or party failing to make disclosure or discovery in an effort to

obtain it without court action." (Doc. 39 at 1-2.) Because Fails did not comply

with the mandatory prerequisites of the Rule, Defendants request that the Court

deny Fails' motion. *Id.* at 2. Fails did not reply.

The Court finds that the Defendants have demonstrated that Fails did not

comply with the meet and confer requirement of the Federal Rules of Civil

Procedure relative to discovery motions. This requirement is also incorporated

into this Court's Local Rules, which provide: "[t]he court will deny any discovery motion unless the parties have conferred concerning all disputed issues before the motion is filed." L.R. 26.3(c). Accordingly, Fails' Motion for Protective Order and Motion to Compel will both be denied. Moreover, as set forth below, Defendants' Motion for Summary Judgment will be granted on grounds unrelated to Fails' discovery disputes. Thus, at this juncture, both of Fails' motions are moot.

Fails has also filed a motion requesting that this Court reconsider its prior denial of his motion for summary judgment. (Doc. 55.) While motions to reconsider are left to the discretion of the district court, *Herbst v. Cook*, 260 F. 3d 1039, 1044 (9th Cir. 2001); *Barber v. Hawaii*, 42 F. 3d 1185, 1198 (9th Cir. 1994), they are also generally disfavored. *See, Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F. 2d 918, 925-26 (9th Cir. 1988). "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 770 F. 2d 906, 909 (3rd Cir. 1985), cert. denied, 476 U.S. 1171 (1986). Disagreement with a Court's order is an insufficient basis for reconsideration, and such a motion should not be used to make new arguments or to ask the Court to rethink its prior analysis. *See e.g., Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983) (holding that "Plaintiff improperly used the motion to reconsider

3

to ask the Court to rethink what the Court had already thought through – rightly or

wrongly.").

Moreover, Local Rule 7.3 provides:

(a) Leave of Court Required.   Before the entry of a judgment adjudicating
all of the claims and the rights and liabilities of all the parties in a case,
any party may make a motion before a judge requesting that the judge
grant the party leave to file a motion for reconsideration of any
interlocutory order made by that judge on any ground set forth in L.R.
7.3.(b)(1) or (2).   No party may file a motion for reconsideration
without prior leave of court.

(b) Form and Content of Motion for Leave.   A motion for leave to file a
motion for reconsideration must be limited to seven pages and must
specifically meet at least one of the following two criteria:

(1)(A) the facts or applicable law are materially different from the fact or
applicable law that the parties presented to the court before entry of
the order for which reconsideration is sought, and

(B) despite the exercise of reasonable diligence, the party applying for
reconsideration did not know such fact or law before entry of the
order; or

(2) new material facts emerged or a change of law occurred after entry of
the order.

(c) Prohibition Against Repetition of Argument.   No motion for leave to
file a motion for reconsideration may repeat any oral or written argument
made by the applying party before entry of the order.   Violation of this
restriction subjects the offending party to appropriate sanction.

Fails' filing is not in compliance with the procedural requirements of the

Local Rules.   He did not file a motion for leave to file a motion for

reconsideration.   But even construing Fails' filing liberally and excusing his filing

error, he has still violated the prohibition of L.R. 7.3(c) by merely repeating the same arguments made prior to entry of the order.

Fails did not present any newly discovered evidence or material facts to the Court. Fails simply explains that he disagrees with this Court's analysis, and he reiterates his belief that the Defendants' general denial of his claims as set forth in their Answer is inadequate and should result in summary judgment in his favor. (Doc. 55 at 3-4.) Fails has provided no legitimate legal basis for this Court to reconsider its prior order denying him summary judgment. There has been no "mistake, inadvertence, surprise, or excusable neglect" on the part of the Court; no "newly discovered evidence"; no void judgment; and no change in law or manifest legal error. Fed. R. Civ. P. 60(b).

In short, Fails is not entitled to relief from the Court's prior order. Fails is simply attempting to re-litigate issues the Court previously considered when denying his motion for summary judgment; such action is improper. Fails' Motion for Reconsideration will also be denied.

## II.    Defendants' Motion to Modify

Defendants have filed a Motion to Modify Statement of Undisputed Facts in which they seek to replace the unredacted Affidavit of Undersheriff Roos (Doc. 44-1 at 1-94), with an identical document containing necessary redactions. See generally, (Doc. 51.) While Fails apparently takes no issue with substituting the

redacted affidavit, he seeks to have an additional document, "Exhibit A," added to the record. See generally, (Doc. 52.) Fails' filing is nonresponsive.

By their motion, Defendants seek appropriate redactions to comply with Fed. R. Civ. P. 5.2. The Defendants' request is a reasonable and will be granted. The Clerk of Court will be directed to place Document 44-1 under seal. Defendants shall file Document 51-1 as a supplement to Defendants' Statement of Undisputed Facts (Doc. 44).

## III.    Background

Plaintiff John Daniel Fails, Jr. was incarcerated at the Custer County Detention Center ("CCDC") in Miles City, Montana, from June 13, 2017, to August 1, 2017. Defendant Tony Harbaugh is the Sheriff of Custer County, Defendant Pat Roos is the Custer County Undersheriff, and Defendant Roland McGrath (identified as "Mr. Roland" in the complaint) is the Detention Sergeant of the CCDC. Defendant Kim Jerke is a registered nurse who provides medical services for inmates incarcerated at CCDC.

Fails is a Type I diabetic. He alleges he received inappropriate care for his diabetes while incarcerated at CCDC. Fails alleges that as a result of Defendants' actions, his blood sugar dropped to dangerously low levels, which resulted in two separate hospitalizations. Fails also claims that the inadequate care received at CCDC resulted in diabetic foot ulcers and bone infections, which required ongoing

medical care. This care included weeks of antibiotics, installation of an intravenous PICC line, and amputation of the small toe on his right foot. Fails also asserts he was segregated in a holding cell as a form of punishment for his diabetes in violation of the Americans with Disabilities Act ("ADA").

Fails claims constitutional violations under 42 U.S.C. § 1983 and statutory violations under the ADA, 42 U.S.C. §12132, thereby invoking the federal question jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

## IV. Applicable Law – Summary Judgment Standards

Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting

evidence that negates an essential element of the non-moving party's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the non-moving party's evidence. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The opposing party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). In deciding a motion for summary judgment, however, the Court views the

evidence in the light most favorable to the non-moving party and draws all

justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255;

*Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

Also, because Fails is proceeding pro se, the Court must construe his

documents liberally and give them "the benefit of any doubt" with respect to

Defendants' summary judgment motions. *Frost v. Symington*, 197 F.3d 348, 352

(9th Cir. 1999). *See also Erickson v. Pardus* 551 U.S. 89, 94 (2007).

## V. Discussion

### A. Fails' Response/Verified Complaint/Sworn Statement

To meet the requirements of Fed. R. Civ. P. 56, the Local Rules of this Court

require that a party moving for summary judgment file a Statement of Undisputed

Facts, setting forth each fact the party relies upon to support its motion, with

pinpoint citations to the record. L.R. 56.1(a). In turn, the "party opposing a

motion for summary judgment must file a Statement of Disputed Facts

simultaneously with and separately from the response brief." L.R. 56.1(b). The

Statement of Disputed Facts must address each of the moving parties' Statement of

Undisputed Facts and state whether the fact is undisputed or disputed. If any fact

is disputed, the opposing party must "pinpoint cite to a specific pleading,

deposition, answer to interrogatory, admission or affidavit before the court to

oppose each fact." L.R. 56.1(b)(1)(B). The rule further provides that "[f]ailure

to file a Statement of Disputed Facts will be deemed an admission that no material facts are in dispute." L.R. 56.1(b)(2)(d).

The Local Rule finds support under Fed. R. Civ. P. 56(e)(2), which allows a court to "consider the fact undisputed for purposes of a [summary judgment] motion" if an opposing party "fails to address another party's assertion of fact as required by Rule 56(c)." The Advisory Committee Notes recognize that this "approach reflects the 'deemed admitted' provisions of many local rules." Fed. R. Civ. P. 56 Advisory Committee Notes (2010). See also, *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (recognizing the validity of local rules which deem facts admitted for summary judgment purposes when not properly opposed).

In accordance with the requirements of the Local Rules, Defendants filed a Statement of Undisputed Facts. (Doc. 44.) In response, Fails filed what is purported to be a Statement of Disputed Facts as required by Local Rule 56.1(b). See, (Doc. 47.) But his statement does not expressly identify any facts with which he takes issue. Fails' Statement of Undisputed Facts consists of the statement that he intends to rely upon the medical records, affidavits, and declarations already in the record, as well as his Complaint and Amended Complaint, to establish genuine issues of material fact. *Id.* at 1. Further, without elaborating, Fails simply claims the affidavits filed in support of

Defendants' motion for summary judgment are perjured, and he restates his belief that the deliberate indifference to his serious medical needs cost him his small toe and nearly cost him his life. *Id.* at 2. Therefore, Fails' has not complied with either the Local Rules or the Federal Rules of Civil Procedure, and his failure can be deemed an admission that there are no genuine issue of fact relative to this motion.

Nevertheless, Fails did verify his Complaint and Amended Complaint and affirmatively declared under penalty of perjury that the information set forth therein "is true and correct." (Doc. 2 at 8; 12 at 4.) Fails also submitted a Sworn Declaration. (Doc. 4.) The Court finds Fails' verified complaints and declaration satisfy the requirements for a valid, unsworn declaration set forth in 28 U.S.C. § 1746. *See Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995). Thus, given the leniency provided to pro se litigants, the Court will consider appropriate facts stated in his complaints and declaration to the extent the facts are admissible and asserted upon Fails personal knowledge, as opposed to his mere information and belief. *Id.* at 460; *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

## B. Undisputed Facts

On April 28, 2017, Fails saw Dr. Richard Curtis in Pocatello, Idaho, for the purpose of establishing medical care. (Defendant's Statement of Undisputed

Facts (SUF), Doc. 44 at ¶ 3.)  Fails had been living in his pickup truck, and he advised Dr. Curtis he had not been taking insulin to treat his Type I diabetes because he could not afford the medicine.  *Id.* at ¶ 5.  It is unclear how long Fails had been living with Type I diabetes.  At his first visit, Fails advised Dr. Curtis he had been diagnosed a year earlier, but in a subsequent visit he told Dr. Curtis he had been diagnosed at the age of 13.  *Id.* at ¶¶ 5, 7.  During his deposition, Fails stated he was first diagnosed in 2002.  *Id.* at ¶ 7.[1]

Fails saw Dr. Curtis again on May 9, 2017.  Although his insulin supplies were ordered for him at his previous appointment, Fails did not pick up the supplies until the day before this visit.  *Id.* at 6.[2]  Fails advised Dr. Curtis he did not like to take his medication and was not regularly testing his blood sugars.  *Id.* at ¶ 7.

At a follow-up appointment on May 19, 2017, Fails' diabetes remained poorly controlled, and he still had not obtained the blood glucose reader discussed at his previous appointment.  *Id.* at ¶ 8.[3]  During this appointment, Dr. Curtis observed a diabetic ulcer on the fifth digit of Fails' right foot; Fails advised Dr.

---

[1]See also, Fails' Deposition Excerpt (Doc. 44-3 at 2:1-9) (Fails advises he first became aware he was diabetic in 2002 following a diagnosis in Texas).

[2]See also, (Doc. 44-1 at 41-43)(Dr. Curtis's treatment notes from 5/9/17).

[3]See also, (Doc. 44-1 at 44-46)(Dr. Curtis's treatment notes from 5/19/17).

Curtis the ulcer had been present since February. *Id.* at ¶ 9. Dr. Curtis arranged for Fails to see another physician, Dr. Price, on May 24, 2017, to assist in treating the diabetic ulcer. *Id.* But it does not appear Fails ever saw Dr. Price or had a follow-up visit with Dr. Curtis.

Fails was subsequently arrested on a warrant and transported to Montana. On June 13, 2017, Fails was booked into the CCDC. *Id.* at ¶ 10.[4] Shortly after he was booked, Fails met with Registered Nurse Kim Jerke to discuss his medical needs and treatment. *Id.* at ¶ 11. Jerke had been a registered nurse since 1991 and had extensive experience dealing with diabetic individuals. *Id.* Jerke contacted Dr. Curtis' office, and Fails medications were adjusted in consultation with Dr. Curtis. *Id.* at ¶ 13.[5] Fails' blood sugar levels were then checked four times each day, before meals and at bedtime, and also upon Fails' request. *Id.* at ¶ 11. Fails' blood sugar levels fluctuated widely during his stay at CCDC. *Id.* Jerke also cleaned, bandaged, and assessed Fails' foot ulcers. *Id.* at ¶ 12.

Jerke set up an appointment for Fails to see a Miles City physician, Dr. Cadwell, so that he could have a local physician monitor his insulin levels and treat

---

[4]See also, (Doc. 44-1 at 4)(Custer County arrest report).

[5]See also, (Doc. 44-1 at 9)(prisoner history notes indicating on 6/17/17 Fails began taking 35 units of Lantus only, rather than a combination of Lantus and Humulin. Fails took the medication without issue).

his foot ulcers. *Id.* Fails had his first consult with Dr. Cadwell on June 20, 2017.

Jerke met with Fails several times each week to discuss his health issues. Fails advised Jerke that he attempted to control his diabetes through diet. Fails requested a diet of 10,000 calories per day; Jerke dismissed this as medically inappropriate. *Id.* at ¶ 14. After consulting with nutrition staff, Jerke determined that Fails' daily caloric intake from meals, including a second dinner tray, was 3,892. Additionally, Fails was consuming an estimated extra 1,000 calories each day from commissary items. *Id.*

Jerke was concerned about Fails' diet, knowing high glucose levels can delay healing and increase the chance for infection. Jerke therefore consulted Dr. Cadwell and was advised that Fails' consumption of nearly 5,000 calories each day was too much. Dr. Cadwell prescribed a diet of 2,500 calories, preferably high in protein. *Id.*[6] Dr. Cadwell also stated Fails should not consume sweets. *Id.* Jerke implemented the dietary modifications following consultation with Dr. Cadwell. *Id.* Fails was upset about this dietary regulation and became angry at Jerke. *Id.* at ¶ 17.

---

[6]See also, (Doc. 44-1 at 58)(correspondence between Jerke and Dr. Cadwell).

Fails began experiencing an extreme drop in blood sugar levels in the early morning hours.[7]   Jerke became concerned that Fails was attempting to regulate his blood sugar with junk food items from the commissary, so she requested diabetic restrictions be placed on Fails' commissary orders.  *Id.* at ¶ 19.[8]   But Fails continued to be noncompliant with the restrictions.  *Id.* at ¶ 20.[9]   On July 13, 2017, Dr. Cadwell advised Fails should be on a diabetic diet with no candy or chocolate.  *Id.* at ¶ 21.   That same day his blood level tested at 60, and he was given a nutrition shake immediately.  *Id.* at ¶ 22.

On July 15, 2017, Jerke ordered all candy and confections be removed from Fails' cell; detention staff took candy, soda, and powdered lemonade mix from Fails' cell and placed it with his property.  *Id.* at ¶ 23.   On July 16, 2017, at 4:04

---

[7]See e.g., (Doc. 44-1 at 10-11)(on 6/29/17 Fails' blood level at 3:30 a.m. was 65, he was provided a nutrition shake and peanut crackers; on 7/2/17 Fails' blood level at 4:58 a.m. was 64, he was given crackers and a nutrition shake; on 7/3/17 Fails' blood level at 5:01 a.m. was 49, peanut crackers and a nutrition shake were provided; on 7/4/17 Fails' blood level at 5:00 a.m. was 51, staff provided peanut crackers and a nutrition shake; on 7/5/17 Fails' blood level at 4:00 a.m. was 52, Fails was given peanut crackers and nutrition shake).

[8]See also, (Doc. 44-1 at 11)(prisoner history notes indicating that on 7/5/17 Nurse Jerke requested a diabetic restriction be placed on Fails' commissary due to Fails' attempting to regulate his blood sugar levels with junk food which is exacerbating his health issues.)

[9]See e.g. (Doc. 44-1 at 11-12)(indicating on 7/9/17 CCDC staff observed Fails in the dayroom collecting five pieces of cake from other inmates; on 7/14/17 staff observed Fails eating a honey bun.)

a.m., Fails blood sugar was 60.   He was offered a nutrition shake, but he initially

refused, demanding instead that his commissary items be returned.   *Id.* at ¶ 24.[10]

On July 18, 2017, Fails filed a grievance, expressing anger at the dietary

restrictions and at having his commissary items taken from him.   *Id.* at ¶ 25.[11]

Fails did not complain of or mention his foot ulcer.   *Id.*   Fails demanded his

commissary be returned and that he be provided candy to control his blood sugar.

*Id.*[12]   Fails was provided a response to the grievance, and advised that his diet was

ordered by Dr. Cadwell, and that the nurse had coordinated his diet with the CCDC

kitchen staff accordingly.[13]   The commissary items in Fails' property that were

sugar free and low in carbohydrates were returned to him.   *Id.* at ¶ 26.

Nevertheless, Fails' blood sugar continued to fluctuate widely, and he remained

non-compliant with dietary restrictions. *Id.* at ¶ 27.[14]

---

[10]See also, (Doc. 44-1 at 13)(on 7/16/17 Fails informs staff, "I will drink the shake when I get my damn commissary," and "I want my damn commissary or I'll be pressing charges on y'all for theft.")

[11]See, (Doc. 44-1 at 20)(Fails' "Emergency Grievance" indicating that Jerke and Sgt. McGrath were conspiring to deny Fails double portions of meals as purportedly ordered by Dr. Cadwell and threatening Fails with isolation in deliberate indifference to his serious medical needs.)

[12]See also, (Doc. 44-1 at 23-24)(Fails' letter to Undersheriff Roos complaining of diet and commissary issues, difficulty with cellmate, and seeking to revoke prior medical releases and Jerke's access to his records.)

[13]See, (Doc. 44-1 at 21)(response to Fails dated 7/19/17).

[14]See e.g. (Doc. 44-1 at 64)(CCDC staff observed another inmate hand Fails a bowl

On July 23, 2017, Fails was found unresponsive, and his blood sugar level was 42. Fails was transported to the hospital by ambulance. *Id.* at ¶ 28. Fails' insulin was adjusted and his blood sugar regulated. *Id.* Fails was encouraged to use aquacel/Tegaderm on his foot ulcer and was prescribed Septra/Bactrim, an antibiotic. He was also encouraged to discuss diabetic shoes during his follow-up appointment with Dr. Cadwell.[15]

On July 24, 2017, Fails was again found disoriented and unresponsive; his blood sugar level was 37. *Id.* at ¶ 30. Fails was taken back to the hospital. *Id.* Fails insulin levels were adjusted. *Id.* at ¶ 31. Cellulitis of his foot was noted. *Id.* While there is no indication that the wound was of particular concern, Fails was advised to follow-up on wound care for the small ulcers on his feet. *Id.*[16] Fails was also directed to continue on a 3,000-calorie diet, and to take a carb/protein snack and two glucose pills if his blood sugar level dropped below 75. *Id.* Fails did not complain to hospital staff about his foot ulcer. *Id.* at ¶ 32. On July 25, 2017, prior to his discharge, a doctor looked at Fails' foot and told him

---

of food; Fails ignored staff reminder that he was on a limited-calorie diet).

[15]See, (Doc. 44-1 at 70-73)(Discharge instructions/After visit summary).

[16]See, (Doc. 44-1 at 74)(discharge summary).

to continue doing what he was doing. *Id.* at ¶ 33.[17] Fails washed his foot with soap and water every day and kept the ulcer covered with a band-aid. *Id.* at ¶ 34.

Fails continued to be noncompliant with his diet and expressed unhappiness at not being allowed commissary. *Id.* at ¶ 35. After his return from the hospital, Fails refused to have his blood sugar checked at midnight. *Id.* at ¶ 36. He was therefore placed in an observation cell where changes in his condition and his compliance could be monitored. *Id.* at ¶ 36. On July 26, 2017, Fails was advised by letter from Undersheriff Roos that the nurse and staff had been following the doctor's orders in his treatment and care, and that they would be placing him in a holding cell to monitor his actions and his eating, not as a form of punishment, but rather for his own health and safety.[18]

Fails was released to the custody of Park County to address pending charges on August 1, 2017. CCDC spent $13,750.33 on Fails' medical care and hospitalization during the 49 days he was detained at the facility. *Id.* at 43.[19]

---

[17]See also, (Doc. 44-3 at 6-7)(Fails advised by doctor at Holy Rosary Hospital to continue what he was doing with his ulcer; Fails explains he washed it with soap and water each day and kept it covered.)

[18]See, (Doc. 44-1 at 25).

[19]See, (Doc. 44-1 at 94)(indicating $2,622.09 was paid to Big Sky Pharmacy; $1,116.40 was paid to M.C. Ambulance Service; $1,219.14 was paid to Holy Rosary Clinic; and, $8,792.70 to Holy Rosary Hospital).

According to Jerke, Fails' foot ulcers were not infected and were in the healing stages when he left CCDC. *Id.* at ¶ 37.[20] Fails did not request treatment for his foot ulcers when he was the custody of the Park County Detention Center. *Id.*[21] Fails was released from the Park County Detention Center on August 9, 2017. The following day, Fails went to the hospital in Livingston, Montana, and states he was put in a walking boot after some of the dead tissue was removed from his foot.[22] Fails then returned to Pocatello, Idaho, where he resumed working until he was arrested again on September 20, 2017. *Id.* at ¶¶ 39-40.

At some point following his September arrest, Fails was placed in custody of the Montana State Prison. On December 12, 2017, Fails saw Dr. Pine at Pintler Surgical Specialists for his right foot ulcer. Fails advised Dr. Pine that he had the ulcer for approximately 6 months, and that it has "been treated on and off during his incarceration at different facilities." (Doc. 21-1 at 8.) Dr. Pine performed an examination and discussed treatment options with Fails. *Id.* at 8-9. On January 16, 2018, Dr. Pine performed a dissection of Fails' small right toe. *Id.* at 13.

/ / /

---

[20]See, (Doc. 44-2 at ¶ 12)(Aff. of Jerke).

[21]See, (Doc. 44-3 at 12)(Fails deposition excerpt indicating he did not seek medical attention for his foot ulcers while in custody in Park County but did request items to keep the ulcers clean).

[22]See also, (Doc. 44-3 at 11)(Fails deposition excerpt).

## C. Medical Care – Fourteenth Amendment Standards

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted.) Fails was incarcerated at CCDC as a pretrial detainee. Thus, Fails' rights relative to the conditions of his confinement and medical care are addressed under the due process clause of the Fourteenth Amendment to the United States Constitution. *Oregon Advocacy Center v. Mink*, 322 F. 3d 1101, 1120 (9th Cir. 2003).[23] "[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F. 3d 1118, 1124-25

---

[23]Historically, a pretrial detainee's claim challenging an adverse condition of confinement under the Fourteenth Amendment was governed by the analysis under the Eighth Amendment applicable to a comparable claim brought by a convicted inmate. But in 2015, the Supreme Court's decision in *Kingsley v. Hendirckson*, __ U.S. __, 135 S. Ct. 2466 (2015) changed the calculus of the analysis applicable to a pretrial detainee's claims under the Fourteenth Amendment. In *Kingsley*, the Supreme Court concluded that the Eighth Amendment's subjective standard is not applicable to a pretrial detainee's claim for excessive force under the Fourteenth Amendment. *Kingsley*, 135 S. Ct. at 2472-73. Instead, the courts must analyze the defendant's conduct under an objective standard and consider whether a defendant's acts or omissions were objectively unreasonable in view of all of the facts and circumstances of the particular situation. *Id.* at 2473.The Ninth Circuit applies *Kingsley's* objective standard to a pretrial detainee's claims. See, *Castro v. County of Los Angeles*, 833 F. 3d 1060 (9th Cir. 2016).

(9th Cir. 2018), cert. denied, 139 S. Ct. (2019). In *Gordon*, the Ninth Circuit established the necessary elements a pretrial detainee must demonstrate to support a claim asserting he was not provided adequate medical care:

> (i)the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved- making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, at 1125.

The first *Gordon* factor presents a threshold question: did the defendants make an intentional decision related to the conditions of plaintiff's confinement? *Gordon*, 888 F. 3d at 1125. There is no dispute between the parties that Defendants' decisions, in consultation with Dr. Curtis and Dr. Cadwell, to develop and implement a course of care for Fails, regarding his medication, blood sugar monitoring, diet, and ulcer treatment, was an intentional one. Accordingly, the first *Gordon* prong is satisfied.

Next, *Gordon* requires the Court to consider whether the defendants' intentional decision concerning plaintiff's conditions of confinement put the plaintiff at a substantial risk of suffering serious harm. *Gordon*, 888 F. 3d at 1125. The undisputed facts do not support an inference that the course of medical

treatment undertaken by CCDC staff, in consultation with the pertinent medical professionals, put Fails at risk of suffering serious harm.

It is undisputed that Fails' diabetes had been poorly managed prior to his arrival at CCDC. He was not taking prescribed medication or regularly monitoring his blood sugar levels. Upon booking, an initial effort was made to gather information, including his medical history, to adequately care for Fails. Moreover, ongoing efforts were undertaken, and then continuously modified, to address Fails' medical issues and the corresponding fluctuating blood sugar levels that existed throughout his stay at CCDC. Nurse Jerke and CCDC staff, in conjunction with medical advice, repeatedly made efforts to address and attempt to control Fails' medical issues. But it is undisputed that Fails remained resistant and uncooperative to the dietary restrictions. Thus, it was not the conditions of confinement that put Fails in harm, but rather Fails' own non-compliance with the restrictions and his insistence on attempting to manage his diabetes via unlimited calorie consumption.

Accordingly, it appears that the conditions of confinement, specifically the medical care provided, were adequate. Thus, the undisputed evidence is insufficient to support a finding in Fails' favor under *Gordon's* second prong. Fails cannot make a sufficient showing to establish the acts of Defendants created a substantial risk of harm.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstance of each particular case." *Gordon*, 888 F.3d at 1125. The mere lack of due care is insufficient to prove a Fourteenth Amendment violation. *Id.* "Thus the plaintiff must prove more than negligence but less than subjective intent – something akin to reckless disregard." *Id.* (citation and quotation omitted).

Moreover, the defendants are only liable if they failed to take available measures to abate the risk of harm. *Gordon*, 888 F. 3d at 1125. As set forth above, the undisputed facts show that in the 49 days Fails was at the CCDC, the defendants regularly consulted with Fails, monitored his condition, and adjusted the course of treatment, as necessary, in relation to his needs. While Fails may have been unhappy with the efforts undertaken, particularly as it related to restrictions placed upon his diet, it is undisputed that the defendants took reasonably available measures to abate risk to Fails.

Upon his arrival, Nurse Jerke, an experienced practitioner, consulted with Fails. Nurse Jerke contacted Fails' provider in Idaho, Dr. Curtis, and in consultation with Dr. Curtis, made an adjustment to Fails' medication. Jerke then set up an appointment for Fails with a local physician, Dr. Cadwell. Fails' blood sugar levels were checked 4 times each day and also upon Fails' request. Jerke regularly met with Fails. In consultation with Dr. Cadwell, Fails' diet was

adjusted in an effort to regulate his blood sugar levels. Eventually, given concerns that Fails was attempting to regulate his blood sugar with items obtained from the commissary, diabetic restrictions were imposed upon Fails. Nevertheless, Fails remained non-compliant with the dietary restrictions.

In addition, following two significant drops in his blood sugar levels, Fails was taken immediately to the hospital and treated accordingly. Following these hospitalizations, and given the CCDC's concerns for Fails' health, he was ultimately placed in an observation cell so that his diet and care could be more closely monitored. It is undisputed that CCDC and the treating medical providers spent a significant amount of time and resources on Fails' care. All of these risk abatement measures were objectively reasonable. Fails has presented no evidence to dispute the legitimacy of these measures. Accordingly, Fails has failed to demonstrate a genuine issue relative to the third prong of *Gordon*.

As noted above, Defendants have the initial burden to produce evidence which either: (1) negates an essential element of the non-moving party's claim, or (2) shows that the non-moving party does not have enough evidence of an essential element to ultimately carry his burden at trial. *Id.* The Court finds Defendants have met their burden under Rule 56(c) by showing that the conditions of Fails' confinement did not put him at substantial risk of suffering severe harm, and that Defendants took reasonable available measures to abate that risk.

In response, Fails has not identified evidence which would create a genuine factual dispute on these matters, nor has Fails demonstrated the Defendants failed to meet an objective standard of care in the treatment provided. Fails alleges that due to the purportedly inadequate care he received at CCDC, he required emergent care and nearly lost his life, and that his foot ulcers developed into bone infections which required subsequent medical care and the amputation of his small right toe. But Fails has not presented reliable evidence that would support his conclusion. The undisputed facts and medical records establish that Fails' diabetes was uncontrolled and unregulated prior to his booking at CCDC. Far from providing inadequate care, officials at CCDC repeatedly attempted to address Fails' health issues through diet restrictions with which Fails refused to comply and actively attempted to undermine.

Additionally, in relation to the foot ulcer, Fails advised Dr. Curtis that he first noticed the ulcer on his right foot in February of 2017. When Fails was transferred to Park County, he did not request treatment for the ulcers. Between Fails' release from Park County and his treatment at Pintler Surgical in December of 2017, it is unclear what, if anything, Fails did to treat his symptoms. In short, Fails has presented no competent evidence to support his conclusion that the conditions of his confinement for the 49 days he spent at CCDC worsened his ulcer or resulted in the eventual amputation of his right toe.

Considering the facts of this case under the standard provided by *Gordon*, the Court finds Fails' denial of medical care claim does not present a triable issue. Accordingly, Defendants are entitled to judgment in their favor as a matter of law. See, Fed. R. Civ. P. 56(a).

## D. Qualified Immunity

In §1983 actions, the doctrine of qualified immunity protects state officials from personal liability for official conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)(citations omitted). The standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)(internal quotation omitted).

The threshold question in considering application of a qualified immunity defense is whether, "taken in the light most favorable to the party asserting the injury...the facts alleged show the [defendant's] conduct violated a constitutional right?" *Saucier v. Katz*, 553 U.S. 194, 201 (2001)(citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). If, viewing the alleged injuries in a light most favorable to the non-moving party, the Court finds that a constitutional right does not appear to have been violated, the moving party is entitled to qualified immunity. *Id.*

As set forth above, Fails has not demonstrated that any of the named

defendants violated his constitutional rights.   Accordingly, Fails cannot make a threshold showing and the Court's inquiry is complete.   Defendants are entitled to qualified immunity.

### E.   ADA & Placement in Holding Cell

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."   42 U.S.C. § 12132; see also, *Sheehan v. City & Cty. of S.F.*, 743 F. 3d 1211, 1232 (9th Cir. 2014), reversed in part on other grounds, 135 S. Ct. 1765 (2016).   To establish a claim under the ADA, a plaintiff must demonstrate: (1) he is a qualified individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of a public entity's service, programs, or activities; (3) he was either excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities; and (4) such exclusion or discrimination was by reason of his disability. *Vos v. City of Newport Beach,* 892 F. 3d 1024, 1036 (9th Cir. 2018).

In *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998), the Supreme Court recognized the ADA applies to state prisons.   "Although incarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access, mental health services and other activities or services undertaken by law

enforcement and provided by correctional facilities to those incarcerated are services, programs, or activities of a public entity within the meaning of the ADA." *Lee v. City of Los Angeles*, 250 F. 3d 668, 691 (9th Cir. 2001). Inmates must allege that they have been denied the benefits of the services, programs, or activities of the prison, or have been subjected to discrimination, by reason of their alleged disability. See, *Armstrong v. Wilson*, 124 F. 3d 1019, 1023 (9th Cir. 1997), cert. denied, 524 U.S. 937 (1998).

Fails alleges that the Defendants violated the ADA by placing him in an observation cell following his release from the hospital. Fails states he was first placed in a holding cell on the morning of July 21, 2017, "because of his blood sugar dropping so low." (Doc. 4 at 4.) He apparently was housed again in the holding cell for a short time between his ER visits on July 22, 2017 and July 23, 2017. *Id.* at 5. After returning from his second trip to the ER, Fails was again placed in a holding cell. Fails remained in the holding cell from July 25, 2017, until his transfer to Park County on August 1, 2017; a total of 6 days.

Fails asserts claims against the defendants in their individual and official capacities, and alleges his federal statutory rights under the ADA were violated when defendants "denied him the privileges and benefits by having him segregated dues to his disability, i.e., Type I Diabetes." (Doc. 12 at 2). By statute, a Title II ADA claim must be brought against the state or the state entity; claims against

individuals must be brought in their official capacities because no individual capacity claims exist under the statue. See, *United States v. Georgia*, 546 U.S. 151, 159 (2006); *Vinson v. Thomas*, 288 F. 3d 1145, 1156 (9th Cir. 2002), cert. denied, 537 U.S. 1104 (2003); see also, 42 U.S.C. §12132 (redress available for discrimination by a "public entity"). Therefore, to the extent Fails seeks to advance a claim against defendants in their individual capacities, the claim is not sustainable.

It appears, however, that Fails also wishes to advance a claim against Defendants in their official capacities. An official acting and being sued in his or her official capacity is essentially a suit against the public entity for which they work; therefore, the employer is a "public entity" and proper defendant under Title II of the ADA. See, *Armstrong v. Wilson*, 124 F. 3d 1019, 1025 (9th Cir. 1997). To the extent Fails sues each defendant in his/her official capacity for violations of the ADA, the claim is properly before the Court. Nonetheless, Defendants should still be granted summary judgment.

A "qualified individual" is "an individual with a disability who, with or without reasonable modifications...meets the essential eligibility requirements" to participate in "programs or activities provided by a public entity." 42 U.S.C. §12131(2). The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities" of the plaintiff. 42

U.S.C. §12102(1).   As set forth above, Fails alleges he is disabled because of his diabetes.   Diabetes is considered a "physical impairment" under the ADA, but Fails has not explained how his diabetes "substantially limits" a major life activity. See, *Fraser v. Goodale*, 342 F. 3d 1032, 1038 (9th Cir. 2003).   But even if the Court were to determine Fails is a "qualified individual with a disability," he has not alleged facts that would establish a discrimination claim against Defendants under the ADA.

The Defendants have come forward with facts to establish that Fails was placed in the observation cell for medical purposes, not as punishment.   Fails was advised that he was placed in the cell so that his diabetic condition and compliance with physician's orders could be closely monitored.   See, (Doc. 44-1 at 2-3); see also, Letter from Roos, (Doc. 44-1 at 25) ("At this point, we have you in holding to monitor what you are doing and eating. It is not punishment; it is to keep you alive and healthy. This will not be permanent by any means, but I can't say when for sure we can move you back to population.")   Claims under the ADA cannot be based on medical treatment decisions.   *Burger v. Bloomberg*, 418 F. 3d 882, 883 (8th Cir. 2005), citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir.2005) (Rehab Act, like ADA, was never intended to apply to decisions involving medical treatment); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir.2005) (inmate's claims under Rehab Act and ADA were properly

dismissed for failure to state claim as they were based on medical treatment decisions). *Id.* See also, *Copelton v. Corr. Corp. of America*, 2009 WL 4063907 (D. Mont. Nov. 23, 2009).

Thus, Defendants have again sustained their burden to come forward with evidence which negates a requirement of Fails claim under the ADA. In response, Fails has not come forward with any facts which create a genuine issue as to the reason he was placed in the observation cell.

Moreover, Fails does not explain what benefits and/or services he wished to receive or what he was purportedly denied because of his disability. Fails states he was denied telephone access while in the holding cell. (Doc. 4 at 6.) It appears, however, that Fails used the phone on July 25, 2017, at 17:05. See, (Doc. 44-1 at 16.) Additionally, it appears that, while Fails was not allowed to use the phone in the general housing unit, he was able "to use the blue phone and the grey phone in booking during daylight hours" until 9:00 p.m. *Id.* at 17. Moreover, Fails was apparently able to call his son during this time period. In response to Fails' call, his son called CCDC on July 28, 2017. *Id.*

In short, Fails has not set forth any facts to support a claim that he was subjected to intentional discrimination by reason of his disability or excluded from participation in any CCDC program or activity. Rather, Fails' claim centers around the decision to place him in holding based upon medical reasons and does

not concern a discriminatory denial of services, programs, or activities. Fails

simply advances a disagreement with his placement and possibly a difference of

opinion regarding his medical treatment, but not discrimination under the ADA.

Accordingly, summary judgment should be granted in favor of the Defendants on

Fails' ADA claim.

Based on the foregoing, **IT IS HEREBY ORDERED**:

1.  Fails' Motion for Protective Order (Doc. 35), Motion to Compel (Doc.

37), and Motion for Reconsideration (Doc. 55) are DENIED.

2.  The Defendants' Motion to Modify the Statement of Undisputed Facts

(Doc. 51) is GRANTED. The Clerk of Court shall place Doc. 44-1 under seal.

Defendants shall file Doc. 51-1 as a supplement to Defendants' Statement of

Undisputed Facts.

3.  The Defendants' Motion for Summary Judgment (Doc. 42) is

GRANTED.

4.  The Clerk shall enter judgment accordingly.

DONE AND DATED this 18th day of June, 2019.


*/s/ Timothy J. Cavan*
Timothy J. Cavan
United States Magistrate Judge